IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| D.A. NOLT INC., | : | |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE PHILADELPHIA MUNICIPAL | : | |
| AUTHORITY *et al.,* | : | No. 18-4997 |
| *Defendants* | : | |

## M E M O R A N D U M

PRATTER, J.                                                                JUNE _____, 2022

The City of Philadelphia hired general contractor D.A. Nolt Inc. to redo the roof on the new City police headquarters. Once Nolt finished the roof, after the plans for the new headquarters had been scrapped, the City refused to pay the balance, pointing to delays in completing the project and puddles of water found inside the building once the roof was finished. So Nolt sued for breach of contract. In a bench trial, this Court ruled in favor of Nolt's claim in large part and found that the City frequently had acted unreasonably throughout the project.

To finish out the case, Nolt now moves for $2,315,418.44 in attorneys' fees, expenses, interest, and penalties. Specifically, Nolt requests:

>       $987,188.68 in attorneys' fees
>
>       $167,362.99 in expenses
>
>       $962,743.03 in pre-judgment interest and penalties on its contract balance
>
> +    $197,974.57 in pre-judgment interest on its acceleration costs and extra work

>       Total: $2,315,269.27, plus $23.49 a day in post-judgment interest[1]

---

[1]      To calculate these sums, the Court starts with the amounts specified in Nolt's briefs, Doc. No. 118, at 10 and Doc. No. 114-2, and removes the stipulated deductions submitted to the Court, Doc. No. 124.

1

Though conceding that it must pay most of the interest, the City insists that it should not have to pay the 1% penalty on the contract balance or Nolt's attorneys' fees and expenses. Under Pennsylvania law, the City has to pay these only if it acted in bad faith, and as the City sees it, though it might have been mistaken in withholding the contract balance, it did not do so arbitrarily or vexatiously. But this Court has already found otherwise. The Court thus grants Nolt's requests, with a few modifications, and awards $985,609.22 in interest and penalties, plus post-judgment interest of $22.19 a day, and $1,120,199.67 in attorneys' fees and expenses.

## BACKGROUND

The City hired D.A. Nolt to install a new roof and fix the façade on the new police headquarters for over $13 million. The City issued its Notice to Proceed in September 2015, which gave Nolt 450 days, or until December 16, 2016, to finish its work. For five months, the parties went back and forth with proposed schedules. Meanwhile, the City issued three bulletins changing the steel design for the roof. For the first two bulletins, the City asked Nolt to estimate the extra time and cost, but instructed Nolt not to make the proposed changes yet. For the third bulletin (called "Bulletin 7"), issued in March 2016, the City told Nolt to proceed immediately, as this would be the final steel design.

Nolt could not reasonably begin the steel work until the City finalized the design. Nolt had to measure from the design's "control points," which would not be set until the final design was itself set. The steel work had no "float," meaning that each day of delay in the steel work pushed the entire project back by a day. The City knew, or at least reasonably should have known, that these redesigns would very likely delay the project. In fact, Nolt repeatedly told the City that the design changes might well delay the project. But the City refused to take responsibility for the delay. So Nolt accelerated its work, with its employees working overtime to finish the project by the original deadline.

By December 16, 2016 (the original deadline for the project), Nolt had substantially completed the roof. At that point, Nolt had finished over 96% of the total work, above the 90% threshold set by the contract for substantial completion. The permits and licenses had been issued, and the City could move on to the next stage of the renovation. Indeed, the City paid Nolt for 90% of the total work, and issued punch lists of final tasks to do. Yet the City refused to consider the project substantially complete because it had found some pools of water on the fifth floor of the building.

Prior to the renovation, the building had been severely deteriorated, with many leaks. Though the new roof fixed these rampant leaks, by January, the fifth floor of the building still had some small puddles. At that point, Nolt still had to finish installing the metal flashing, which makes the roof watertight. There were also several potential sources for the water puddles unrelated to or separate from Nolt's work.  For example, the plumber subcontractor had recently installed new bands on the pipes for the fifth floor, and water had been dripping from those bands. The pipes themselves had been installed in 1929, and had outlived their useful life by about 30 to 40 years. Parts of the old roof had been outside the scope of the Nolt project and so were left in their original condition. Plus, the building was not yet temperature controlled, meaning that some condensation formed.

Despite these many possible explanations, the City made no systematic attempt to identify the source of this puddled water. The City could have isolated a portion of the roof, filled it with water, and watched for leaks on the fifth floor. Or the City could have sprayed down the roof in a continuous fashion and looked for leaks. It did no such thing.

Instead, the City immediately blamed Nolt. The City hired a roofing consultant to conduct an infrared scan to look for areas of potential moisture. For those areas that ran "hot," indicating

*potential* moisture, Nolt cored two-inch samples, and the consultant tested them for moisture. The tests confirmed that two of those areas had moisture, in an 8' by 40' wet patch and an 8' by 8' wet patch. In those two areas (out of a total of 16 equivalent roof areas), the City made Nolt replace far more than the wet patches, amounting to one-third of the one roof area and 85% of the other roof area, based solely on the subjective opinion of Carl Pizzo, the City's quality-control inspector, that the roof materials were wet. Mr. Pizzo had no formal training or certifications in quality control work or roof installation, and had never previously worked for a construction manager in any capacity. Nolt replaced these dry portions at Mr. Pizzo's direction because the City had threatened to charge Nolt $10,000 a day in liquidated damages if it did not.

That May, the approved roofing manufacturer issued warranties for the roof, guaranteeing that the roof would be watertight for 20 to 30 years. The City refused to accept these warranties and hired a different roofing consultant to conduct another infrared test. This test identified *minor* moisture damage in 2.9% of the total roof. Yet the City told Nolt that it would have to replace 70% of the roof. Though the City later backtracked, it still required Nolt to replace the roof well beyond the areas designated by the roofing consultant. For example, in the ninth roof area, the City required Nolt to replace almost the entire area, even though the area had just 2% moisture content. Nolt complied because the City was still threatening it with $10,000 a day in liquidated damages.

In total, after both infrared scans, Nolt removed and replaced over 50% of the entire roof it had installed. The City blamed Nolt for the identified moisture. But neither the City nor its roofing consultants or experts, at the time or at trial, identified any actual defects in Nolt's work. In fact, the roofing system that Nolt used made it difficult for water to penetrate the roof, much less migrate to other portions of the roof. The City never investigated other potential sources of moisture, instead insisting with no proof that Nolt had installed a faulty roof.

In August, the City demanded that the roofing manufacturer reinspect the roof and confirm that its warranties remained valid. The manufacturer affirmed the warranties, but the City still refused to accept the roof. The City had its roofing consultant take a third infrared scan on the roof. The scan once again identified some "hot" areas. Nolt took two-inch cores, as dictated by industry standard, which showed that the roof was dry. Not content, the City demanded that Nolt take one-foot samples. Nolt continued to take two-inch cores. Mr. Pizzo then refused to witness the testing and left the roof. Just two cores contained any discernible moisture, one from a water blister and the other from condensation, and Nolt remedied both areas.

The City continued to refuse to accept the roof. So, in February 2018, Nolt performed the one-foot cuts demanded by the City. Those samples all came back dry. At this point, the City recognized the roof as complete, and, in February 2018, backdated the substantial completion date to August 28, 2017.

That May, upon finishing the many punchlists issued by the City, Nolt submitted its final requests for payment to the City, seeking to recover the unpaid contract balance and to be compensated for the extra costs it incurred in accelerating its work and replacing undamaged portions of the roof. The City refused to pay, claiming that Nolt's delays and faulty work had required the City to keep personnel on the project for far longer than expected, driving up its costs.

Nolt filed this suit, and the City countersued. The Court granted partial summary judgment to Nolt and dismissed the City's claim for liquidated damages, reasoning that the contract's $10,000-a-day liquidated damages provision was unreasonable and punitive. *See* Doc. No. 48. The Court then presided over a 10-day bench trial and issued its Findings and Conclusions.

The Court found that the City, not Nolt, had delayed the project, and the City knew of this delay but refused to grant an extension, instead constructively instructing Nolt to accelerate its

work. Nolt had substantially completed the roof by December 2016, and the City had no good faith reason to refuse to accept the roof then or over the next year. The City wrongly required Nolt to replace dry portions of the roof, and then refused to pay for the extra work. The City also had no reasonable excuse for not paying the remaining contract balance. Because the City, not Nolt, dragged the project on well past the substantial completion date, the City could not recover for its extra costs, most of which the City could have not recovered even if Nolt had been at fault because the contract waived consequential damages and the City failed to mitigate its costs.

Having won on all of its claims, Nolt has now moved to mold the judgment to include interest and penalties. Nolt has also moved for payment of its attorneys' fees and expenses.

## LEGAL STANDARDS

Each side typically pays its own litigation costs. But, if a statute or contract between the parties permits it, the prevailing party may recover attorneys' fees and expenses. *Fidelity-Phila. Tr. Co. v. Phila. Transp. Co.*, 173 A.2d 109, 113 (Pa. 1961). The party seeking fees bears the burden of proving that it is entitled to an award and what that award should be. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). To show that the award sought is reasonable, the party must document counsel's hourly rates, the hours worked, and the specific work done during those hours. *Id.; Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 361 (3d Cir. 2001). "Ideally, of course, litigants will settle the amount of a fee," so that the fee request does "not result in a second major litigation." *Hensley*, 461 U.S. at 437. But if the parties cannot settle, the court, pulling on its experience in this case and others, must exercise its discretion to set an appropriate fee. *Id.; Evans*, 273 F.3d at 362.

6

DISCUSSION

## I.    Nolt is entitled to attorneys' fees and expenses

Pennsylvania's Prompt Payment Act requires municipalities like the City to promptly pay their bills to private contractors like Nolt. *East Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 232 (Pa. Commw. Ct. 2015). Under the Act, if a private contractor successfully sues a municipality for failing to pay a contract balance, the court has discretion to award "reasonable" attorneys' fees and expenses to the private contractor. 62 Pa. Cons. Stat. § 3935(b). This fees award is intended to "level[ ] the playing field between a government agency, which can use its taxing power to fund litigation, and a private contractor, which lacks this resource." *F. Zacherl, Inc. v. Flaherty Mech. Contractors, LLC*, 131 A.3d 1030, 1044 (Pa. Commw. Ct. 2016) (Leavitt, J., concurring). Absent a fees provision, "the damages awarded to [a contractor] will not make [the contractor] whole because the monies will be used to pay attorney fees and costs." *Id.*

In this spirit, Nolt seeks to recover its attorneys' fees and expenses for this case. In total, after write-offs, reductions, and agreements between the parties, Nolt seeks $987,188.68 in fees and $167,362.99 in expenses. The Court grants its request but reduces the fees to $952,836.68.

### A.  Nolt moved for fees and expenses at the appropriate time

Starting with a procedural challenge, the City asserts that the Court had already denied Nolt's requests for attorneys' fees and expenses in the Findings and Conclusions issued after the bench trial, making Nolt's current motion an impermissible motion for reconsideration.

The Court has made no such ruling. There is not a single mention in the Findings and Conclusions of attorneys' fees or expenses, much less an *explicit* denial of fees and expenses. For good reason: neither attorneys' fees nor expenses were before the Court at the bench trial. "[I]t would [have been] difficult, if not impossible to assess attorney fees during the case in chief."

7

*Polselli v. Nationwide Mut. Fire Ins. Co.*, No. 91-cv-1365, 1993 WL 479050, at *2 (E.D. Pa. Nov. 12, 1993). Logically, final fees and expenses cannot "be determined until [counsel] ha[s] completed all work on the case—which would not occur until final judgment had been entered for the case." *Id.* Hence, the Federal Rules dictate that "[a] claim for attorney's fees and related nontaxable expenses must be made by [a separate] motion" "filed no later than 14 days after the entry of judgment," "unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A), (B)(i). Given that attorneys' fees are not an element of a breach-of-contract claim, Nolt's motion for fees was appropriately filed *after* the Court entered judgment in its favor on the merits.

### B. Nolt is entitled to fees and expenses because the City acted in bad faith

To warrant payment of fees under the Prompt Payment Act, the City must have "acted in bad faith," such that "the withholding was arbitrary or vexatious." 62 Pa. Cons. Stat. § 3935(b); *see A. Scott Enterprises, Inc. v. City of Allentown*, 142 A.3d 779, 787–90 (Pa. 2016). In other words, the withholding must have been "without sufficient ground in either law or fact with the purpose of causing annoyance," and not in "good faith" based on perceived deficiencies in the construction. *Dep't of Gen. Servs. v. Pittsburgh Bldg. Co.*, 920 A.2d 973, 991 (Pa. Commw. Ct. 2007).

The City insists that, though its decision to withhold the contract balance might have been *mistaken*, it was not in *bad faith*. Yet the Court, in its Findings and Conclusions, has already found otherwise.

Nearly five months after the start of the project, "the City materially redesigned the steel and roof work." Conclusions of Law ¶ 27, Doc. No. 107. Logically, such a redesign would delay the project. But when Nolt said it needed more time, the City refused to even consider an extension

and instead "maintained that it bore no responsibility for delaying Nolt's progress." *Id.* ¶¶ 18, 36; *cf. Dep't of Gen. Servs.*, 920 A.2d at 976–78, 991 (municipality suspended project for five months and then refused to pay additional costs). So Nolt worked overtime to finish the roof on the original schedule. Conclusions of Law ¶¶ 95–96. The City then refused to pay these $44,887.54 in acceleration costs.

Thanks to its acceleration, Nolt substantially finished the roof on time. *Id.* ¶ 9. But the City refused to accept the roof, pointing to some water the City found inside the building. The City did not even attempt to investigate the source of this water but instead immediately blamed Nolt. Without proof that the roof was actually defective, the City directed Nolt to redo over half the new roof, threatening Nolt with liquidated damages of $10,000 a day if it did not. *Id.* ¶¶ 58 n.4, 65, 67. The City then refused to pay these $786,163.48 in extra roofing costs and withheld the remaining contract balance of $1,087,776.53. *Id.* ¶ 73; *cf. A.G. Cullen Constr., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1165–66 (Pa. Commw. Ct. 2006) (state agency refused to reimburse contractor after requiring work outside the scope of the contract). Meanwhile, the City failed to mitigate its own costs, keeping personnel on site even though little to no work was occurring, and then faulted Nolt for these unmitigated expenses. Conclusions of Law ¶¶ 122–24.

In sum, the City engaged in "obdurate," "arbitrary," and "vexatious" conduct throughout this project. *Id.* ¶¶ 11, 18, 50. Nolt is thus entitled to its reasonable attorneys' fees and expenses.

**C. Nolt can recover for *all* its fees and expenses**

The Prompt Payment Act permits attorneys' fees and expenses in "any proceeding to recovery any payment under" the Act. 62 Pa. Cons. Stat. § 3935(b). The Prompt Payment Act covers claims to recover unpaid contract balances but does not control other contract claims between a municipality and a contractor. That means that a contractor can recover the attorneys'

fees and expenses incurred to prove the municipality had to pay the contract balance, but not those fees incurred for any other breach-of-contract claims. *See James Corp. v. North Allegheny Sch. Dist.*, 938 A.2d 474, 490–91 (Pa. Commw. Ct. 2007).

Here, Nolt had a breach-of-contract claim to recover its remaining contract balance, but it also had other breach-of-contract claims: Nolt also faulted the City for not paying acceleration costs after constructively ordering Nolt to accelerate, for not paying the costs to replace portions of the dry, finished roof, and for not paying for extra work done as part of several change orders. Pointing to these different claims, the City asserts that Nolt needs to make "an effort … to apportion the time spent by counsel on [these] distinct" contract claims. *Croft v. P & W Foreign Car Serv., Inc.*, 557 A.2d 18, 20 (Pa. Super. Ct. 1989). As one option, the City suggests that Nolt should receive only 42.5% of the requested fees because the contract balance accounted for 42.5% of the total damages awarded to Nolt. *See Klipper Constr. Assocs., Inc. v. Warwick Twp. Water & Sewer Auth.*, Nos. 471 C.D. 2014 & 792 C.D. 2014, 2014 WL 10316918, at *13 (Pa. Commw. Ct. Dec. 16, 2014).

But, as Nolt points out, most of its other breach-of-contract claims are *inseparable* from its claim for the contract balance. The City refused to pay the remainder of the contract balance because, as the City saw it, Nolt delayed the construction and then built a faulty roof. Those are the exact same reasons why Nolt had to accelerate its work and then replace the roof. These claims go beyond just "*some* overlap." *A. Scott Enters., Inc. v. City of Allentown*, 2018 WL 10810731, at *11 (Pa. Ct. C.P. Sept. 30, 2018) (emphasis added). They are all "based on a common core of facts and related legal theories"; the claims cannot be separated. *Croft*, 557 A.2d at 20.

After all, the evidence for each claim is the same. For example, Nolt's scheduling expert, Russell Berner, opined that the City's redesign in Bulletin 7 delayed the project and that Nolt

should have been given an extension of time. Nolt's roofing expert, Scott Dolan, in turn opined that the City unjustifiably rejected the roof as incomplete. This expert testimony did double duty, showing both that the City wrongly withheld the contract balance and that Nolt was entitled to acceleration costs and the cost to replace the roof. *Cf. James Corp.*, 938 A.2d at 491–92 (because expert testimony had been "limited strictly to the ... damages sustained as a result of work acceleration," the expert fee could not be recovered). This evidentiary overlap makes apportionment pointless; counsel would have had to do the same work, even without the additional contract claims. *See Krishnan v. Cutler Grp.*, 171 A.3d 856, 871–72 (Pa. Super. Ct. 2017).

That said, a small portion of Nolt's attorneys' fees is apportionable. In addition to its main contract claims, Nolt also sued the City for some unpaid change orders. These change orders involved discrete, small incidents where Nolt had to make modifications during construction and the City disagreed about the appropriate additional payment. The evidence for these claims did not overlap with that of the other claims. Recognizing this, Nolt has already agreed to apportion out these costs, adopting the City's proposed method: because the award for these change orders amounted to 2.96% of the total award, Nolt deducted 2.96% of its charged fees. Any other apportionment is inappropriate, if not impossible.

### D. Nolt's requested fees and expenses are reasonable

Nolt seeks $987,188.68 in attorneys' fees. Nolt may recover for fees that are reasonable and not "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *accord In re Huffman's Estate*, 36 A.2d 640, 643 (Pa. 1944). In deciding if a fee is reasonable, courts often start with the lodestar method, which multiples a reasonable hourly rate by a reasonable number of hours expended on the case and then compares that figure to the actual fees charged. *Hensley*, 461 U.S. at 433. Courts then consider other relevant factors, including:

- The amount of work performed;
- The character of the legal work;
- The difficulty of the case;
- The importance of the litigation;
- The amount of money in question;
- The degree of responsibility incurred;
- The professional skill and standing of the attorneys; and
- The results obtained.

*In re LaRocca's Trust Estate*, 246 A.2d 337, 339 (Pa. 1968); *see Hensley*, 461 U.S. at 434–35. Here, the lodestar is $952,836.68, which is slightly lower than the sum sought. The Court reduces the award to match the lodestar and awards the full amount based on the quality of counsels' work on this complicated case.

To start, the firm has charged (mostly) reasonable hourly rates. Many different attorneys and paralegals worked on this case, with billing rates adjusted for their experience. Partners charged between $395 to $430 an hour, senior counsel $345 an hour, senior associates $280 to $355 an hour, junior associates $245 to $285, paralegals $170 to $195 an hour, and summer associates $195 to $200 an hour. These billing rates are, for the most part, reasonable and reflect the prevailing market rate for legal services in Philadelphia (and in some instances are much lower than market). *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984); *Attorney's Fees*, Community Legal Services, https://clsphila.org/about-community-legal-services/attorney-fees/.

Though conceding that the senior lawyers have charged a reasonable rate, the City complains that the rates for junior and summer associates are higher than the rates established by Community Legal Services, a Philadelphia legal services organization, whose rates reflect the prevailing market rate for general legal services in Philadelphia. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). For junior associates, CLS sets an hourly rate of $200 to $220, and for

summer associates, an hourly rate of $110 to $160. In comparison, the firm charged between $245 and $285 for junior associates, and $195 to $200 for summer associates. The firm objects to matching its junior lawyers' rates to CLS's rates, pointing out that its lawyers have special "skill, experience, and reputation" in construction law that are not reflected in the CLS rates. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). Though certainly true of the firm's more experienced lawyers, its junior lawyers have not yet had sufficient specialized experience and training to warrant an across-the-board deviation from market rates as Nolt proposes. *Cf. E.C. v. Sch. Dist. of Phila.*, 91 F. Supp. 3d 598, 606 (E.D. Pa. 2015). The Court thus reduces the rate for the firm's junior associates to $210, and the rate for the firm's summer associates to $135, the midpoint of the corresponding CLS ranges.

Next, the firm spent a reasonable amount of time on this case. In total, counsel billed 4,013 hours. This case lasted over three years and went through partial summary judgment and a 10-day bench trial. Discovery was voluminous, with hundreds of lengthy documents. Each side had two experts. The case featured many discrete and complex factual and legal issues: Is Nolt or the City responsible for the scheduling delays? Did Nolt provide proper notice of this delay? Did the City constructively instruct Nolt to accelerate? Did Nolt substantially finish the roof in time? Were there defects in the finished roof? Did the City's agents instruct Nolt to replace dry portions of the roof? Should the City have accepted the warranty on the roof? Is Nolt responsible for the City's expenses after Nolt said it finished the roof in December 2016? These difficult issues were ultimately resolved in a 117-page opinion that reflected the depth and breadth demanded by this case. Indeed, the City has not contended that the case should have required any less work.

Based on the firm's reasonable rates and the reasonable time spent on the case, the lodestar is $952,836.68—or the firm's original request of $987,188.68 minus the $34,352.00 reduction to

the billings of the junior and summer associates. This sum is reasonable, and the Court will award the full $952,836.68. The firm is a recognized leader in construction law, and counsel have brought that specialized knowledge to this case. Counsel have ably run this lengthy case from start to finish. The case was important, with millions of dollars in damages at stake, and complex, with many documents to comb through and a lengthy contract to interpret. And in the end, counsel earned the favorable verdict. *See Hensley*, 461 U.S. at 434–35.

Nolt also seeks $167,362.99 in expenses for experts, transcripts, process servers, copying, Westlaw searches, and e-discovery. These expenses were "reasonable in light of the nature of the action and the tasks that needed to be performed." *Serrano v. Sterling Testing Sys, Inc.*, 711 F. Supp. 2d 402, 424 (E.D. Pa. 2010). The Court thus grants this request in full.

## II.   Nolt is entitled to recover pre- and post-judgment interest and penalties

Contract damages "should place the non-breaching party as nearly as possible in the same position it would have occupied had there been no breach." *Davis v. Borough of Montrose*, 194 A.3d 597, 612 (Pa. Super. Ct. 2018) (internal quotation marks omitted). Merely awarding the balance due on a contract does not do so. Years have passed, and the balance is now worth less than it was when the contract was breached. If the balance had been paid then, the non-breaching party could have put it to good use, or at least collected years of interest on it. Recognizing this, Pennsylvania law awards interest to parties that prove a contract has been breached. *Fernandez v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988).

Nolt seeks 10% interest and a 1% penalty on the contract balance, 6% interest on the sum awarded for its other contract claims, and post-judgment interest of $23.49 a day on the entire award. Besides reducing the interest on the contract balance to 6% and the daily post-judgment interest to $22.19, the Court grants this request in full.

## A. Nolt is entitled to 6% interest on the contract balance

Under the Prompt Payment Act, Nolt is entitled to interest on the unpaid contract balance. 62 Pa. Cons. Stat. § 3941(b). The City does not contest that it must pay interest, just the rate at which it must pay. The contract permitted the City to retain part of each payment during the project, with this retainage to be paid in full upon substantial completion. Standard Contract Requirements § 55, Def.'s Tr. Ex. 1, at 78. Because the contract had a "provision[] for retainage," Nolt is presumably entitled to an interest rate of 10% per year. 62 Pa. Cons. Stat. § 3941(b). But, as the City recently pointed out, the City financed this project via bonds. That means that the rate should be the lower of 10% or the bond issue's rate of interest, which is 4.0655%, but cannot be lower than the legal rate of interest, which is set by statute at 6%. *Id.*; 41 Pa. Stat. § 202. Thus, as both parties agree, the correct interest rate is 6%.

Yet the City never explained at trial that the project was financed by bonds, much less proved the interest rate of the bonds. Because of that omission, the Court, in its Findings and Conclusions, has already awarded Nolt 10% interest per year. Conclusions of Law ¶ 51. The City is now asking the Court to correct that award.

To be clear, the City never filed a motion to amend; it has simply asked in its brief that the Court find that the project was financed via bond and that the bond interest rate was 4.0655%. Even if the City had formally filed a motion to amend, however, the motion would be too late. Motions to amend are due within 28 days of the Court issuing its Findings and Conclusions. Fed. R. Civ. P. 52(b). The City did not raise this issue until two weeks past that deadline. The Court cannot extend that deadline. Fed. R. Civ. P. 6(b)(2); *Gribble v. Harris*, 625 F.2d 1173, 1174 (5th Cir. 1980).

That said, district courts have inherent authority to amend their Findings and Conclusions *sua sponte. Reinstine v. Rosenfield*, 111 F.2d 892, 894 (7th Cir. 1940); *see, e.g., Darensburg v.*

*Metro. Transp. Comm'n*, No. 5-cv-1597, 2009 WL 1974496, at *1 n.1. (N.D. Cal. July 7, 2009). That is the court's prerogative in presiding over bench trials that demand specific, detailed findings of fact and conclusions of law in lieu of a general verdict. *See* Fed. R. Civ. P. 52(a)(1). Still, courts should be hesitant to amend their Findings and Conclusions except to remedy clear errors. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *see* Fed. R. Civ. P. 52(a)(6). And they should be particularly hesitant if the correction would disrupt the judgment or unduly prejudice the parties.

Here, the Court will exercise its inherent authority to correct the interest rate. Nolt does not contest that the correct interest rate is 6%. The interest rate is a collateral issue; it does not go to the merits of the case. No party will be prejudiced by the correction; the City gets to pay a lower interest rate, and Nolt cannot complain that it is now being denied a higher interest rate that it should not have been awarded in the first place. Certainly, the City could have—and should have—put on this evidence earlier; the City knew that Nolt had asked for interest on the unpaid contract balance. *See* Doc. No. 61 ¶ 201. But the Court will overlook this omission, so as to ensure the proper operation of the Prompt Payment Act. Thus, Nolt is entitled to 6% interest on its contract balance, which amounts to $262,662.59.

### B. Nolt is entitled to a 1% penalty on the contract balance

Under the Prompt Payment Act, the City must pay pre-judgment interest on the unpaid contract balance. But it also might have to pay, in the Court's discretion, "a penalty equal to 1% per month" for any contract balance "withheld in bad faith." 62 Pa. Cons. Stat. § 3935(a). The City encourages the Court to decline that discretion here, reasoning that the City withheld the balance in good faith because it thought that Nolt had caused the delays and then built a faulty roof. But this plea for leniency comes too late. This Court has already found that the City "had no reasonable

reason to refuse to issue payment to Nolt" and so must pay the additional 1% penalty per month. Conclusions of Law ¶¶ 41, 51.

Looking for an escape hatch, the City points out the City has to pay the penalty only for the time periods when its withholding was in bad faith. As the City sees it, its withholding was in good faith until Nolt served its expert report on January 24, 2020, in the middle of this litigation. Until that point, the City reasons, Nolt had not submitted a detail report showing that it needed extra time to finish the project because of the City's redesign in Bulletin 7. Yet the City had *actual* notice of a delay from time it began redesigning the roof, even if Nolt did not put the City on *formal* notice of exactly how much time it needed. Findings of Fact ¶¶ 200–02; Conclusions of Law ¶ 18. Even if Nolt had drafted a formal extension request, the City would have rejected it. Conclusions of Law ¶ 29. In other words, there is nothing to apportion; the City has been withholding the contract balance in bad faith since May 2018, when Nolt first submitted its request for the contract balance. The City thus must pay the 1% penalty for each month it withheld the balance, for a total of $524,972.06.

### C.  Nolt is entitled to pre-judgment interest for the extra work it did

The City must also pay pre-judgment interest on the $926,847.23 worth of extra work that Nolt did in accelerating construction, inspecting and replacing the roof, and performing other extra projects not provided for in the contract. Under Pennsylvania law, a non-breaching party has the right to pre-judgment interest as compensation for delayed payment of extra work done under a contract. *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 263–64 (Pa. 2012). By statute, the legal rate of interest is currently set at 6% per year. 41 Pa. Stat. § 202. That amounts to $197,974.57 in pre-judgment interest for the extra work.

For the Court to award mandatory pre-judgment interest, the extra work must have had a "fixed or ascertainable" value at the time of the breach. *TruServ Corp.*, 39 A.3d at 264 (quoting Restatement (Second) of Contracts § 354(1)). In other words, "the debt must have been liquidated with some degree of certainty." *Id*. The requested sum can count as fixed or ascertainable in several different ways:

- Does the contract itself provide for a definite sum of money due?
- Does the contract set a value for the performance rendered?
- Does the contract include a standard or calculation from which the sum due can be calculated?
- Can the value of the performance be determined based on "established market prices" for the performance?

*Davis*, 194 A.3d at 613. Put simply, the requested sum needs to be a sum certain, not an open-ended demand for damages. *Compare Krishnan*, 171 A.3d at 877 (awarding pre-judgment interest because cost to remedy defective home could be ascertained through market prices), *with Cresci Constr. Servs., Inc. v. Martin*, 64 A.3d 254, 265 (Pa. Super. Ct. 2013) (denying pre-judgment interest because the consequential damages sought by the owner of defective house, like legal fees and the cost of maintaining two homes, were not sufficiently ascertainable at the time of construction).

Though conceding that Nolt's acceleration, roof investigation, and extra work costs were fixed or ascertainable, the City insists that Nolt's roof replacement costs were not. The contract did not set a fixed price for replacing the roof, so Nolt was supposed to work on a "force account basis," which meant that they had to submit daily payment requests for the work done that day. Standard Contract Requirements § 52(d), Def.'s Tr. Ex. D-1, at 76. Nolt never submitted these daily account sheets. To the City, that means that the value of the extra roof work cannot be

ascertained from the contract. Not so. The City conflates *notice* of the extra work with the *value* of the work.

At the time the City refused to pay for the roof replacement, the cost of that work was "sufficiently definite" for the City to have "determined its amount with reasonable certainty so that [it] could have made a proper tender" to Nolt. Restatement (Second) of Contracts § 354(c) cmt. c. The City had been given a detailed bill showing that Nolt actually spent $829,628.06 to redo the roof. *See* Pl.'s Tr. Ex. P-276. The City had seen Nolt's rates for roofing work in its bid, and that bid had been incorporated into the contract. *See D.A. Nolt, Inc. v. City of Lancaster*, 256 A.3d 503 (Table), 2021 WL 1904572, at *7 (Pa. Commw. Ct. May 12, 2021). Those rates could be readily confirmed from "established market prices" for the work. *Davis*, 194 A.3d at 613. Thus, the sum due was fixed, or at least ascertainable, at the time of the City's breach. Indeed, the City did not suggest otherwise at the time, instead simply blaming Nolt for not submitting its detailed bill *earlier*. The Court thus awards Nolt $197,974.57 in pre-judgment interest for its extra work.

## D. Nolt is entitled to post-judgment interest

Finally, as the City concedes, it must also pay daily post-judgment interest dating from the Court's judgment on December 21, 2021. 28 U.S.C. § 1961. This interest is calculated by taking the total judgment, or the $2,014,623.76 previously awarded in damages plus the $985,609.22 now awarded in interest and penalties, and multiplying that sum by an interest rate of 0.27%, or the average weekly 1-year constant maturity Treasury yield for the week preceding the Court's judgment. This comes to $22.19 a day. Doc. No. 122-1, at 2. The Court thus awards Nolt $22.19 for each day that the City withholds payment between December 21, 2021 and December 21, 2022.[2]

---

[2] The City has appealed the judgment against it. If, based on that appeal, the City continues to withhold payment past December 21, 2022, the parties must submit an updated post-judgment interest calculation.

CONCLUSION

In sum, the Court awards $262,662.59 in pre-judgment interest on the contract balance, $524,972.06 in penalties on the contract balance, $197,974.57 in pre-judgment interest on the extra work, and post-judgment interest of $22.19 a day. The Court also awards $952,836.68 in attorneys' fees and $167,362.99 in expenses.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE